Arm, LCC, et al. On behalf of the FORUM, Mr. Robert Fredrickson, on behalf of the athletes, Charles Sullivan. Thank you. Good afternoon, Mr. Fredrickson. Thank you, Your Honor. Thank you. I appreciate the privilege of being able to present this case to you orally as well as in the briefs. Judge Daugherty correctly found in this circumstance that the agreement entered into in 1999 to have a member-managed LLC control the assets of the Gallano Farms Trust and created a fiduciary duty among the members of that LLC. Then things went wrong because John and Steve Gallano thought they could control everything as if they owned everything. Judge Daugherty found that the fiduciary duty was breached in the period of time from 2004 through 2008 because the defendants did not pay fair market rent and they were on both sides of the transaction as they were running the LLC and leasing the property to themselves. Judge Daugherty did not find a breach of fiduciary duty on the 1999 to 2003 period of time. And here's where the trial court went wrong. He looked at some landowner-only signed leases that the defendants did not even know about until during the trial. Who signed those leases originally? Weren't they signed by Mr. Gallano? Yes, they were. They were signed in 1996 by Bud Gallano. So they were pre-existing leases? They were pre-existing leases filed with the FSA office and that's where they were located. They were incomplete because they weren't signed by the tenants and they were incomplete because he had cut and pasted the sections and there was no provisions for expenses. But regardless of that, the court should have recognized in this conflict of interest situation that there was a concurrent fiduciary duty owed by Steve and John Gallano to their sisters, regardless of the existence of those leases. Furthermore, in addition to not analyzing what was fair market rent... Well, what were those fiduciary duties that you're alleging were breached with these pre-existing leases? Non-disclosure, excessive expenses, less than fair market rent in a situation where the defendants were on both sides of the transaction. Well, let's put this in perspective. The leases were pre-existing. They were signed by Bud himself. For 1999 through 2003, they set forth the amount of rent per acre and their position can be, well, he just went along with the leases as they were all these years. What did they do wrong, you're going to say? The Leibovitz case does not permit them to do that. But the second thing that really focuses this is how the expenses were handled. In addition to the $80 per acre that the judge said was provided for in those leases, which was clearly below market value by both our expert and their expert. Mr. Fredrickson, you talked about for a minute the Leibovitz case, and I think you rely on your brief also on Anist and another case. But in looking at the facts in those cases, don't the actions in those cases really involve secret activities, coercion? Here, the facts are very different, aren't they? There was no attempt to conceal records. Things were, quote, business as usual, both for operating the farm as well, farm property, as well as the bowling alley. So how, why should we rely on those cases when the facts are very different? Because a couple of things, Judge Enoff. They had an affirmative duty to disclose as fiduciaries to their sisters. There was no obligation of the sisters to ferret out the facts. Well, didn't they have the opportunity to go look at the records any time they wanted? We disputed that. There's testimony by all three of the defendants that that did not occur. In fact, we even got assessed for their changing the lots so that we couldn't get into where the records were kept. But if you look at the expense side of those first five years, what you'll notice is that these leases upon which the trial judge relied have no provision for leases or for expenses. So if you look at the expenses, there was never a year in those first five years when the defendant tenants paid even as much as a net $40 per acre. And 2002, in 2002, they paid a negative rent. They actually were subsidized $15 an acre for the privilege of leasing the property from themselves. It's even more aggravated if you look at the summary of the SSA payments that go to the tenant. And in a couple of those years, they were over $100,000. So the result reached on a fiduciary duty case was that a negative rent was permissible, rents that averaged less than half of the 80 were permissible, that subsidies to the tenants from the government reduced the rents to ridiculously low numbers. So my position is that there was a concurrent fiduciary duty, there was a nondisclosure, and the expenses would have to be analyzed on some type of fiduciary basis. And what was the nondisclosure again? Excuse me? What was the nondisclosure? The plaintiffs never saw that there were two checking accounts, one for the bowling alley and one for the farm. The LLC farm account, they never saw, it was never attended to. The tax returns for all the years in question, they got a K-1, they never got the documents that showed how the income was calculated. The bowling alley, they prepared a balance sheet income statement. There was a similar one for the farms, but it was never given to them. Did the bowling alley continue to disclose to the brothers? Yes. They did the whole entire time? Yes. And a very important point on the bowling alley. First of all, it's a minor asset in the big picture here. You know, in this situation, we've got 37,000 square feet of buildings that they were allowed to use for zero rent. 170,000 bushels capacity of grain storage that they were allowed to use at no rent. They had two farmhouses that were on the property and one that was in town, all of which they were allowed to use free. And then there was 1,500 acres of farmland at what I contend was a ridiculously low rent that they paid. In fact, it was even a negative rent in 2002. Wasn't Bud running this business the same way for years before he died? I mean, wasn't he doing the same thing? Bud handled expenses differently. But when Bud owned everything, he could do it as he pleased, in my opinion. But once the transaction was changed in 1999, after Bud had died and his daughters as well as his sons were beneficiaries, then the boys can't just continue to run the farm like they own it to the detriment of their sisters. Well, let's distinguish it. When the LLC was formed, it was the successor to those leases. Were they not? Didn't they become the successors to the leases? The LLC? I would think so if they were valid leases. Well, how would they know they were not? Bud negotiated the leases. The LLC gets formed, the successor to the leases. They're not involved in negotiating the leases. They simply continue on to honor the leases. Why is that a legal problem? Because there's a concurrent fiduciary duty when John and Steve are running the LLC and they're also on the tenant side of the transaction. So that's one answer. But the second answer is they loaded up the expenses so they ate up all the rent anyway. Well, the expenses are separate. You've been talking about, you've been emphasizing the rent per acre, but that never changed. I'm emphasizing, yeah, the rent per acre never changed. The expenses changed. And to not include the expenses in the analysis seems to me to render the analysis invalid. Because if you just take 2002 and run those expenses in there, you end up with a negative rent. No landlord would ever agree to that. Let's turn for a minute to the issue of the accounting. The trial judge did not grant the request for an accounting for various reasons. But if we look at it, haven't your clients really during the course of this litigation had the benefit of an accounting throughout the course of the litigation? And what purpose would it serve were we to reverse the trial court on this issue? The only, the cases in general hold that when there's a breach of fiduciary duty, that accounting is allowed and permitted. And I think that the plaintiffs have a right under those circumstances. There's the one case out of this district, Kennedy, that seems to say, or at least I read it, that maybe in certain circumstances, in addition to the breach of fiduciary duty, you have to show no adequate remedy alone. Now, to specifically answer your question, we got most of the information. We subpoenaed records from the CPA. We hired our own CPA. We got analysis from an expert on rents. We got appraisals on every piece of property. The reason the accounting is important is because if it's allowed, then we can properly make a claim for our expenses and our attorney's fees, which the judge said if he was going to allow an accounting, he would reserve that for a separate hearing. So those aren't, the hearing never took place on that because it was not an accounting. But I think if every time you were entitled to an accounting, if you filed a suit, you would always get through discovery what you should have gotten ahead of time. But I don't think that's a fair burden to place on the claimants that they have to hire a lawyer, get appraisals, get CPAs, subpoena records from all different sources to get what they were entitled to. And, in fact, what they were entitled to, the burden of proof was on the defendants, not the claimants. So that would be my answer to the accounting question. There's one other part to that, however, and that would be if the court says, if this court says, well, you have to show no adequate remedy at law. Consider this, just in the opinion itself. Judge Daugherty talks about the transaction where John Gallinow offered to sell part of one farm to his sister Jennifer at one price, provided he could buy the rest of the farm at a much lower price. And he said, well, she didn't do it, it didn't happen, so there was no economic damage, no foul. Well, that's why we need equitable relief. You know, just because we stopped somebody in the process of doing something improper and prevented economic damage doesn't mean that they can continue on to do that. The same thing is true as to some of John's efforts to spin off land and develop it himself. It's the same thing as to this got glossed over somewhat in the opinion, but our CPA, which was the only CPA that testified in this case, said reconciling the balance sheet schedule on the tax return with the actual cash position showed over a long period of time that there was $371,000 missing. But it was back in the account by 2008. So I guess you can't figure an economic damage because they took it and returned it. But that certainly is the exact type of thing where you need equitable relief to stop it, to stop it in the tracks. There was a, right during this case, with this all going on, John and Steve sold an easement for $88,000. Never told anybody. They paid your clients though, didn't they? Excuse me? Your clients got the money for the easement, didn't they? Sure, but maybe they didn't want to sell it. Maybe it wasn't, the judge felt it was a fair price. I think under any circumstance of fiduciary duty or member participation in LLC that the sale of a significant asset like that should have been disclosed to them. There was a total control of the management without participation of the plaintiffs by John and Steve. And their answer is, well, that's the way Dad did it. Well, when Dad owned it, he could do as he pleased. But when he died, John and Steve don't own this property. A trust owns it. The members of the LLC all signed an agreement in 1999. They said, here's how we're going to run it. It's even got, and there was some debate on which provision enforceable. But it's even got a provision, and I think it's Section 502 of the agreement that provided it took a two-thirds vote to do almost anything. And my clients own 39%. And there weren't votes on all these different things. Your clients received the benefit from the LLC when some of the strikers went down at the bowling alley, correct? Excuse me? I'm sorry. The Concordia, they paid some expenses there when the strikers went down at the bowling alley, correct? There were some expenses paid. Ultimately, we recovered those back in a case. But the bowling alley is, we've got this LLC checking account that runs all the farms and all the farm businesses. And over here we've got this bowling alley. There's a separate account on that. And the tenant on that is Gallimore Concordia Limited, a corporation. We have no knowledge as to what's going on in the farms. We don't get any records. The girls work at the bowling alley for $12 an hour. They provide information as to receipts and expenses. The defendants have access to all those records. And then this is real important. The three plaintiffs own 30% of Gallimore Concordia Limited, that corporation tenant. The other 70% is owned by the defendants. So not only did they know what was going on, but they controlled the majority interest of the stock of that particular tenant. Who set out the percentage of ownership in that Concordia? I would assume it was Bob Gallimore. Excuse me, Mr. Fredrickson. The timer did go off. You will have time for rebuttal. Oh, okay. Okay. Thank you. Excuse me one second. We have a procedure. Okay. Mr. Dunlop? Yes, good afternoon. Good afternoon. I'm sorry, I'm Charles Dunlop. I'm going to set my clock there so I can keep track of the time. I've listened to the questions so far, and I think you understand what really happened at the trial level. This is not a case of secret dealings. This is not or oppressive practices by a member or a director. This is a case of a longstanding family business that had been run by the party's father, Bud Gallimore. He ran the business, and he set how that business was to go. The customs and practice laid down by Bud Gallimore were followed during his lifetime and after his death, and after the 1996 formation of the LLC without ever a thought of changing it by any party. In fact, the evidence revealed that the LLC was created solely for a tax benefit or purpose and was not created with any intent to change the way the business had been run by Bud Gallimore. Both the plaintiffs in running the bowling alley and the defendants in running the farm side of the LLC business did business and paid the rents and expenses just as Dad had done without a vote, a meeting, or a discussion. That is until 2005 when after meeting with their lawyers on an unrelated matter, the plaintiffs realized that they could greatly benefit by changing the family business, and they could also seek to collect large damages against their brothers for simply carrying on the business the way their father had done it. Counsel, you alluded to carrying on the business of Mr. Gallimore, and we questioned that. There were some preexisting reasons, and I understand, I think we do, that initially they were simply honoring and carrying on with the customs, the leases, and the practices. What about counsel's alluding to the sale of the easement, which was a significant asset? Was that disclosed, and if not, should it have been disclosed? And while you're responding to that, maybe you can address, this is related to the very same thing, I think, the operating agreement, section 5.02, and the requirements there with regard to approval, the percentage approval for such a sale of the easement for the pipeline. I'd be happy to do that, and I can start with, I'll start with the operating agreement. There's been allusion to 5.02 and the required two-thirds, so that's only for the sale of substantially all the assets. If you take a look at the other components of that operating agreement, specifically 7.01, it says that a majority can run the day-to-day operations of the business. Further, if you look at the LLC, the LLC really owns checking accounts because the farmland itself is owned by the trust. Now, with respect to your question regarding the easement, the easement was sold, and the money that they got, there was testimony that the money they got was a fair price, and they did receive it. It was not a sale of substantially all the assets. Does it have to be a sale of substantially all the assets under 5.02, or is it just a sale or leaves them lame? Section 5.01, I believe, says any member can do it. I believe it's 5.02 that says, let me see if I can find it. 5.01 says that any member can manage it. 5.02 says certain transactions require a two-thirds vote, including a sale of substantially all of the LLC assets. And 7.07 provides that a majority interest may act for the LLC except for the sale of any company assets where a two-thirds vote is required. The trial court looked at this and said, if I don't recognize what's happened here, then you've got certain sections that will totally have no meaning whatsoever. He looked at the four corners of the document and correctly determined that this was the only logical understanding you could have to give all of the provisions meeting in the agreement. If I go back to, I think we've talked about the fiduciary duty, and I mentioned that a moment ago. As I said, the leases were all signed by, entered into by Bud Gallinel. Now, if you were to say that there should be a change in those leases because now we have an LLC, well, think of the effect of that. Then any time you're unhappy with a lease, form an LLC and say that it doesn't have to abide by it. I mean, that would make no sense because then every lease could be voided. So this was entered into, and the trial court correctly saw that, that this was entered into. They were not, there was no trickery, no secrecy here. They received a benefit that was of longstanding, the rental amount that they received from their father before the LLC was set. Well, that was fairly clear. That was known for years. Ostensibly, all the parties knew what the rental agreement was. What about the expenses? Is there a possibility that people could be living there, having expenses that are unknown to the other members of the group? How does that enter into this? What's the control on that aspect? Actually, the expenses on both the bowling alley side and the farm side were as they had been for years. Now, the records were kept at the mother's house. That's where the operation, where the records were kept for the bowling side and for the farm side. They were always in a drawer. Any time you wanted to look at them, they were there. We had expert testimony talk about what expenses were, and they all determined expenses were proper. Is that Phyllis Galano's residence? Yes, sir. Is there any evidence that the plaintiffs ever went to Phyllis' residence to inspect the books? I don't know that they did, but they knew that there was testimony. They all knew they were there because they'd been there for years. But they'd never been refused entry? Never. No, as Mr. Fredrickson points out, what Mr. Galano, Bob Galano, I don't know if I'm saying the name right. I think it's Galano. What he did with his property was his preference. He could do what he wants. But when it turned into an LLC, it was shared by all of his siblings. How could they just live life as it was before with respect to spending on the farm property, spending on the housing, that they stayed in basically free of the expenses that were paid? How could they continue to live that way just because that's the way Dad did it? Now everyone is involved. Everyone is sharing in the pot, supposedly. That's correct. And supposedly they're sharing in the pot on both sides. The bowling alley side and the farm side. And the records were kept in the same spot. But what's the price and the monies coming out of that bowling alley versus the monies and the worth of the farm? It's slight compared to this. The farming is a much larger operation. And no one complained that the expenses, because the expenses, the same type of expenses, the amounts may have changed because years went on. But the same type of expenses were all well-known by everybody because they had been the same since Bud Gallinow set it up and his dad before him. They knew what was paid for. The amounts may change because there's inflation, but all of the expenses were known and there was testimony by all the plaintiffs that no one objected to the expenses or the manner in which Bud Gallinow ran the operation. We've talked about an accounting. And first of all, what I didn't say at the beginning and probably should have said was the standard that we should be looking at is whether or not the trial court erred, whether or not his findings were reasonable, arbitrary, or not based upon the evidence. And that would be the standard for all of the various counts and objections by the plaintiffs. I mean, they've indicated that they felt they should have had an accounting. Well, whether to grant an accounting is within the sound discretion of the trial court who has heard the evidence. And he properly denied the accounting because, again, no adequate remedy of law was shown. And he used his discretion. And he used his discretion because the plaintiffs failed to point to any fact to show the trial court's decision was arbitrary. And his decision was well supported by the evidence he heard. The plaintiffs knew that the defendants were running at a rate set by their father. The plaintiffs had full access to all the records to determine the rents and expenses. And the plaintiffs never asked what rents were being paid or asked for the records until this lawsuit was filed. They were kept at the farm and the house, and they were there. When the records were finally asked for, they were given immediately. Now, an accounting at this particular junction would be duplicative and inequitable. Would they get anything more in the accounting than they already received at the trial court through discovery? No. Nothing? No. They had lost access to all the records. And what about allowing attorneys fees and expenses, then? Is that a valid enough reason? I don't believe it was or is. I believe the trial court was correct in exercising his discretion when he heard the evidence and the testimony. Not only did he hear the experts, he listened to the people, he was able to assess demeanor. I believe the trial court properly exercised his discretion on that. Other things that we look at, they've asked that if there was a breach, and they've suggested a breach of the operating agreement. I think I've explained why. I can go back into that if you'd like. I believe the sections are there, and if you read them, they all have a purpose. And, therefore, there was no breach of the operating agreement. If I look at something else they've asked for is to remove the defendants from the LLC. And, again, the trial court said no because the plaintiffs failed to bring an action for disassociation pursuant to the statute. There are certain things that should have been put, but they didn't plead that. And the evidence presented did not justify the removal of the defendants under the statute. Because, again, it's in the sound discretion of the trial court, and he looked at various factors along the way. Defendants did not scheme to keep rental practice a secret. They continued to do it exactly how their dad did it. Maybe that was naive, and that's something the court addressed after 2004. But isn't that beyond naive? When you have a new legal entity, this LLC that was formed, then were to ignore breach of fiduciary, the fact that there may have been a fiduciary duty? I don't think we're ignoring it. I think that they were the defendants. Our clients were the recipients, and they had a benefit that was conferred upon them from their father, which was apart from the fiduciary duty. They absolutely had a fiduciary duty, but they were also recipients of the income from those leases between the years 1997 to 2003. As I said earlier, if you were to buy that argument, then any time you were unhappy with a lease, the thing to do would be to set up an LLC and say, I've got a fiduciary duty and I can't accept this now. Most of those cases that deal with a breach of a fiduciary duty, though, go to trickery, secrecy. All of them do. And this most important thing here, or certainly a key part of it, was the transaction was between Bud Galvin and the LLC. The defendants were not on both sides of this transaction. They were not when it was set up. If I look at, I think I've explained about removing the defendants, and I think the trial court looked at that. They didn't file or inquire or complain until the filing of the lawsuit. There was no showing of a scheme to keep rental prices up. And quite frankly, the plaintiffs conducted the same thing on their side. There's an allegation that they had less of an interest. There's also testimony at the trial court that they ran the day-to-day operation of the bowling alley. Yes, our clients may have had the bigger interest, but we had no idea what those expenses were. They were never shared with us. To claim that we received these is simply disingenuous. The records were kept at the farm, or they were given to Phyllis Gallin on the mother. Do you have any specific comments about the cross-appeal? Yes, I do. You're going to show the cross-appeal's market rate from 2004 to 2008, correct? Correct. We happen to feel in our cross-appeal that equitable estoppel should apply because the plaintiffs did the same thing that the defendants did. And to hold us to a different standard, we believe, would be improper, and we believe that's why the concept of equitable estoppel should apply. The evidence was undisputed. The defendants simply did what had been done before, and the evidence is undisputed that the plaintiffs ran the day-to-day operation of the bowling alley. Do you want to ask? No. Okay. The evidence is undisputed that the plaintiffs did exactly the same thing with the bowling alley that had been done on the farm side. They paid the rent set by Dad. They charged taxes, insurance, and improvements and maintenance to the LLC. And they charged miscellaneous operating expenses to the LLC. But Dad set the rent for the bowling alley. They had the lease up until 2004, and then from 2004 to 2008, there was nothing. So there was no lease set by anyone, correct? That's correct. They continued on the same arrangement that they had before. So then they moved into a different type of lease arrangement, which is month-to-month. And that would be the case for both of them, plaintiffs and defendants. And that is why we've said that their conduct, being the same as ours, should allow equitable estoppel to apply, in which case the rent should not have gone. And that, we believe, was the only place where the trial court actually made a mistake. Thank you. Thank you very much, counsel. Mr. Fredrickson? It's frustrating to repeatedly hear the other side argue that they made full disclosure as to what was going on on the farm side of this transaction. I've cited the record in my brief on page 12, the exact statements that were made by all the defendants, that the information was not given to the three plaintiffs. I don't know what more I can do than to point that out. And they keep saying they knew everything. They knew everything. Well, they didn't know everything. Would any minority member consent to leasing the major asset in an LLC to their brothers for a negative rent? Would any sane person allow 1,500 acres of farmland, 37,000 square feet of metal buildings, 170,000 bushel capacity storage, and three houses be leased for a gross of $120,000 and turn around and pay $60,000 for a 12-lane bowling alley? And then would that same minority member allow the tenants, who were on both sides of the transaction and controlling the LLC, to have the audacity to load up so much in expenses that between 1999 and 2003, the rent never even hit a net of $40 an acre? And it's just plain wrong. We really didn't go very far back into what Bud did, but it's just plain wrong what they're saying, or incorrect, about how Bud handled the expenses versus how they handled the expenses. It's just plain wrong factually. The girls asked their brother, John, about what was going on when the prices were different for him buying versus Jennifer buying. The girls asked John for records on how come a piece of property they were selling had a different price that they had heard than was on the offer that was presented to them. The girls met with Attorney Tobin and asked who represented, at the time, the LLC and the members, and asked him what was going on. The girls hired an attorney, Mr. Lindbergh, who wrote, and asked for the information. And eventually, we filed suit, and that's when we started getting some information. And a lot of that information did not come from the defendants. It came from tax returns we subpoenaed. It came from discovery issues. It came from the FSA office. It came from our expert water center, and some of it came from the defendants. I think the Bierman case is as clear as can be that says when you undertake a fiduciary duty, you can't go to your people on the short end of the deal and say, you should have asked me, you should have looked, you should have noticed that we were running a fireman. It's the burden by clearly convincing evidence. In these situations with a fiduciary duty and a conflict of interest, that the utmost care and disclosure be undertaken by the party in that conflict situation. And it wasn't done. For them to argue we had total access to the records, to me, is ludicrous. We even got stuck for the bill, changing the locks when they were afraid we maybe could get into the, where the records were kept over at the farmhouse. Well, Counsel Lawyer, on that, what specific attempts were made to see the records, and what refusal, how was access denied, specifically? Well, first of all, they were locked up. Well, yeah, I understand that. And before that, they asked John, they didn't give him an explanation. They asked Steve, they didn't give him an explanation. I think they even asked their mother, Phyllis, to give an explanation. They talked to Attorney Tobin, who was then their lawyer. In fact, he was, it's in the record, they brought an agreement up that had been tendered to them by their mother to sell something. And they said to Mr. Tobin, what's going on? And he said, if I'll, if he asks the right questions, I'll answer it. And he suggested that they not sign it. Well, who did Tobin represent? At that time, he represented the members of the LLC, and he represented the LLC. And at that point is when things were so suspicious that the girls went and hired another lawyer from the lawyer that had done the work for the family over the years. But once, here's what's frustrating, when Bud died, then Bud's not running everything anymore. When Bud died, the girls owned 39% of the trust. After Bud died, everybody sat down and entered into an agreement in 1999. And that was a member-managed LLC that by statute gave these girls fiduciary rights. And by statute imposed on their brothers various important obligations that the court has held way up here on fiduciary duties, way up here. I mean, this is not a contract case. This is a breach of fiduciary duty case. And we just back it up and look at the result. I mean, how can you come up with numbers so minuscule? You've seen in the complaint, these assets, the Boeing and there was somewhere around $500,000 and the other stuff, depending on what point in time you pick, over somewhere between $20 and $25 million. And you get your tax return, a K-1 with no other explanation, and you're paying $60,000 rent on your Boeing Alley, and you would think that they would have disclosed what the rent was and what the expenses were and how that number became so low. They didn't. And it's not our duty. It's not our duty to disclose. It's their duty to disclose. Once they have a conflict of interest, they have to tell the other members what's going on. And what was going on were they were loading up the expenses on their side of the deal, and in the case of the Boeing Alley, they were paying a fair rent. They were paying a fair rent. And when I say they, the they are the defendants because they own 70% of the operating company there that was paying their rent. So they really had a conflict of interest on that one, too. I don't know what else to do other than what I did. I went into court. I asked for help from the court. And that's why I'm here. Thank you very much. Thank you. Counsel, thank you very much. At this time, the court will take the matter under advisement and render a decision in due course.